**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Catherine Beasley, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| FuboTV, Inc., | |
| Defendant. | |

Plaintiff Catherine Beasley ("Plaintiff") brings this action on behalf of herself and all others similarly situated against FuboTV, Inc. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on her personal knowledge.

## NATURE OF THE ACTION

1.      Defendant FuboTV, Inc. is one of the largest television streaming and video content providers in the United States. Defendant owns and operates its online and mobile streaming applications, including www.fubo.tv (the "Website"). Unbeknownst to Plaintiff and the Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unauthorized third parties without first complying with the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710.

2.      Defendant's Website and app use first-party and third-party cookies, software development kits ("SDK"), pixels, Facebook's Business Tools, including Advanced Matching

and Conversion API, Google Analytics, and related tracking tools to purposely track, record, and transmit its digital subscribers' interactions with Defendant's Website.

3.     Defendant knowingly installed and used these tools, and it controlled which data was transmitted to unrelated third parties. In conjunction with this, it purposefully and specifically chose to: (1) track and record consumers' viewed video media, (2) disclose that information to Facebook[1] alongside its digital subscribers' individual Facebook ID ("FID") and other persistent identifiers, and (3) did this without its users' knowledge or consent via surreptitious technology.

4.     Importantly, when Defendant transmitted Plaintiff's and other consumers' Personal Viewing Information—*i.e.*, their persistent FID and viewed video content—that information was combined and sent to Facebook as one data point, thereby revealing the identity of the individual who requested or viewed a specific video.

5.     Because an FID is used to identify a specific individual and their corresponding Facebook account, Facebook or any ordinary person can use it to locate, access, and view a particular digital subscriber's Facebook profile, thereby revealing their identity. Put simply, the information Defendant shares with Facebook reveals each and every video a particular digital subscriber has requested or viewed.

6.      Plaintiff and consumers were harmed by Defendant's unlawful conduct, which deprives them of their right to privacy in their own homes, and the disclosures at issue reveal highly personal details regarding their unique video requests and viewing habits.

---

[1] Notably, Facebook Pixel works in conjunction with its Conversion API tool and, as a result, Defendant transmits one copy of its digital subscribers' viewing information directly from its web server to Meta's web servers. Additional copies of this information are also communicated through the use of cookies.

**JURISDICTION AND VENUE**

7.      This Court has original jurisdiction under 28 U.S.C. § 1331 based on Plaintiffs'

claims under the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq.* This Court also has

subject matter jurisdiction over this lawsuit under the Class Action Fairness Act, 28 U.S.C. §

1332(d)(2) because this is a proposed class action in which: (1) there are at least 100 Class

Members; (2) the combined claims of Class Members exceed $5,000,000, exclusive of interest,

attorneys' fees, and costs; and (3) Defendant and at least one Class member are domiciled in

different states.

8.      This Court has general jurisdiction over Defendant because Defendant maintains

its principal place of business within this District.

9.      Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action

because Defendant resides in this District and a substantial part of the events giving rise to

Plaintiff's claims took place within this District.

**PARTIES**

10.      Plaintiff Catherine Beasley is a citizen of California, who resides in Sacramento,

California. Plaintiff Beasley has had a subscription to FuboTv's streaming service which she has

used to request and view prerecorded video content on a regular basis within the last two years

from the filing of this complaint. Throughout the duration of her FuboTv subscription, Plaintiff

Beasley has maintained and used her Facebook and Google accounts which she used and

accessed on a regular basis from the same browser (Chrome) that she used to request and view

FuboTv's video content on the fubo.tv Website.  Pursuant to the systematic process described

herein, her Personal Viewing Information was sent to unauthorized third parties—including

Facebook and Google—without her knowledge or consent each time she requested and viewed

FuboTv's video content. Plaintiff Beasley never gave Defendant express written consent to disclose her Personal Viewing Information to Facebook, Google, or any other unauthorized third party.

11.     Defendant FuboTv, Inc. is a Florida corporation with its principal place of business located in New York, New York.

## GENERAL ALLEGATIONS

### *History and Overview of the VPPA*

12.     The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> "It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong".

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

13.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

14.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to

4

any person, personally identifiable information concerning any consumer of such provider." 18

U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as

"information which identifies a person as having requested or obtained specific video materials

or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider

is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental,

sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C.

§ 2710(a)(4).

***Defendant is a Video Tape Service Provider***

15.     Defendant provides video streaming services to millions of users through its

www.fubo.tv (the "Website") and other applications, and its primary business is the delivery of

on-demand prerecorded video content.

16.      Defendant monetizes this content and its platforms by restricting access to video

content, and only individuals who register with Defendant are granted access to its video content.

17.     To subscribe to Defendant's services, at a minimum, individuals must create an

online account and share their identifying information. To maintain a subscription and access

videos past the free trial period, users must pay a monthly or yearly subscription fee.

***Defendant Knowingly Discloses Consumers' PII To Third Parties***

18.     When subscribers request or view videos on Defendant's Website and

applications, their Personal Viewing Information is transmitted to Facebook, Google, and other

unauthorized third parties as a result of the tracking tools Defendant purposely installed and

implemented on its Website and application. Defendant controlled its Website, applications, and

all of the tracking technologies that it used to transmit its subscribers' Personal Viewing

Information to unauthorized parties. Importantly, Facebook and Google would not have received

Plaintiff's or other Class Members' Personal Viewing Information but for Defendant's decision to install and use Facebook's Business Tools, including the Facebook Pixel and Conversions API, Google Analytics, and other tracking technologies on its Website and applications.

19.     Moreover, Defendant controlled which data was tracked, recorded, and transmitted when its subscribers requested or viewed video content.

20.     Defendant's knowledge as to its conduct is evidenced by the fact that: (1) it chose to track its digital subscribers' interactions with the Website and applications, including the videos they viewed; (2) it requested and installed lines of code that achieved this purpose; (3) it obtained the lines of code from Facebook, Google and other third parties in order to achieve this purpose; and (4) it controlled the information that was tracked, recorded, and transmitted via the Website and the applications.

*Defendant's use of Facebook and Google's Business Tools and Tracking Pixels*

21.     Facebook is a real identity platform, meaning that users are allowed only one account and must share the name they go by in everyday life. To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.

22.     Businesses, such as Defendant, use Facebook's Business Tools to monitor and record their website and app visitors' devices and specific activities for marketing purposes.

23.     More specifically, the Facebook pixel that Defendant installed and used tracked, recorded, and sent Facebook its subscribers' granular website activity, including the names of specific videos that subscribers requested and/or viewed each time they used their FuboTv subscription. The information is not merely metadata.

24.     Defendant's motivation for using the pixel and related Facebook Business Tools is simple—it financially benefits Defendant in the form of advertising and information services

6

that Defendant would otherwise have to pay for.

25.     The information Facebook receives identifies specific subscribers based on their unique and persistent Facebook IDs ("FID"), which is sent to Facebook as one data point alongside the title of the video content the specific subscriber requested or viewed.

26.     Notably, these marketing tools are not required in order for Defendant's Website or app to function properly. Even if it finds the tools helpful, it could have used them in a manner that does not reveal its subscribers' Personal Viewing Information.

27.     Any ordinary person who comes into possession of a Facebook ID can easily use that information to identify a particular individual and their corresponding Facebook profile, which contains additional information such as the user's name, gender, birthday, place of residence, career, educational history, a multitude of photos, and the content of a Facebook user's posts. This information may reveal even more sensitive personal information—for instance, posted photos may disclose the identity of family members, and written posts may disclose religious preferences, political affiliations, personal interests and more.

28.     Defendant also uses Google's Analytics and DoubleClick persistent cookies "application programming interfaces" ("APIs") on its Website and applications. Google is a company that "gets its money by tracking its users and using the data it collects to sell targeted ads to companies."[2] Google's DoubleClick software furthers that by "enable[ing] advertisers to more effectively create, manage and grow high-impact digital marketing campaigns," including by serving specific advertisements to specific users and tracking the number of views on those

---

[2] Matt Krantz, *Ask Matt: Is Google a Tech or Ad Company?*, USA TODAY (July 23, 2013), https://www.usatoday.com/story/money/columnist/krantz/2013/07/23/google-ad-company-tech/2493109/; *see generally* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM (2019).

advertisements.

29.     At a minimum, both Google and Facebook received Plaintiff's Personal Viewing Information as a result of Defendant's data sharing practices and the tools it installed on its platforms.

***Defendant's Use of Tracking Tools***

30.     When a subscriber requests or views a particular video, the specific title of the video is transmitted to Facebook alongside the subscriber's persistent and unique Facebook ID, thereby revealing their Personal Viewing Information to Facebook.

31.     However, subscribers are unaware of this because, amongst other things, Defendant's transmissions are completely invisible to ordinary subscribers' viewing its webpages. Figures 1, 2, and 4 are an attempt at lifting the curtain to show exactly what happens behind the scenes when Plaintiff and other subscribers request or view video content on Defendant's website.

32.     While Figure 1 shows what ordinary subscribers see on their screens as they use the Website, Figure 2 shows the invisible, behind the scenes transmissions taking place.


**[Intentionally Left Black]**



*Figure 1. The image above is a screenshot of the title screen that shows what subscribers see when they request an NFL Football highlights video via the Defendant's streaming platform. The page does not contain any logos or indications that their button clicks are recorded and sent to Facebook.*

33.     The lines of text embedded in Figure 2 plainly show that Defendant sends

Facebook the specific URL assigned to a video (which any person with a FuboTv account can

copy and paste that locator into a web browser and determine the exact video that the subscriber

watched) along with the subscriber's FID (which any person can use to identify a Facebook user)

when the user views the NFL highlights video shown above via the Website.

**[Intentionally Left Blank]**



*Figure 2. The images above represent a screenshot of a network traffic report that was taken when a FuboTv subscriber requested and viewed video content via Defendant's Website, at which time the personal viewing information was transmitted to Facebook.*

34.     The string of numbers contained in the first line of text within Figure 2 ("id= 1534663066852899") corresponds to Defendant's own Facebook identifiers, thereby demonstrating it has indeed installed the Facebook pixel on its Website. The video viewer's Facebook ID was also transmitted to Facebook via the Website, and it is contained in the unredacted "c_user=" cookie in the second picture of Figure 2.

35.     Notably, the URL sent to Facebook also indicates when a user has clicked on the video ("PageView") and immediately precedes the title of the video ("3DVOD_10880618%26airingId%3DVOD_10880618%26programId%3DEP000031284398") meaning it is indeed responsible for transmitting the exact video sent to Facebook. This URL, when pasted on any browser with an active FuboTv account will retrieve the exact same video.

36.     Additionally, Figure 3 below demonstrates that Facebook received Plaintiff's and Class Members' Personal Viewing Information via fubo.tv and that the data was attributed to specific subscribers' unique Facebook accounts each time they requested video content.



*Figure 3. Screenshot taken from the user's personal Facebook account.*

37.     The image in Figure 3, which is a screenshot taken from a subscriber's personal Facebook account, plainly states: "fubo.tv has shared this activity with us using Meta Business Tools."

38.     In addition to the Facebook pixel transmission shown in Figures 1-3 above, Defendant also transmits its subscribers' Personal Viewing Information to Facebook via Conversions API and SDK, and it sends the information to additional unauthorized third parties via Google Analytics and other tracking technologies installed on its website and app.

39.     Figure 4 below demonstrates that Defendant also sends its subscribers' Personal Viewing Information to Google via its Google Analytics tools, Google Tag Manager, DoubleClick Ads (which is owned by Google and used solely for advertising), and related tracking tools.

**[Intentionally Left Blank]**



*Figure 4. The images above represent a screenshot of a network traffic report that was taken when a FuboTv subscriber requested and viewed video content via Defendant's website, at which time the personal viewing information was transmitted to Google.*

40.     The column to the left shows what the user sees before they watch the NFL highlights video via Defendant's Website, and the column to the right depicts the network traffic report, which demonstrates Defendant sent the user's Personal Viewing Information to "doubleclick.net" (including the full URL containing the title of the video). *See supra*, ¶ 35.

41.     Figure 5 below contains all of the additional unique identifiers that Google collected in order to identify a specific user on Defendant's Website.



*Figure 5. The image above is a screenshot of the cookies and other identifiers used by Google to identify FuboTv subscribrers when viewing videos on the Website.*

**Index of Relevant Cookies**

| Field | Value and Explanation |
|---|---|
| _Secure-3PSID | Value: Unique User Identifier linked to a Google account |
| | Explanation: Upon information and belief, this field, including similar permutations, equals a unique alphanumeric value, which is logged when a Google user is signed into their Google account (such a Gmail) and is associated with the information from that account. |

| | |
|---|---|
| X-Client | Value: Unique User Identifier Linked to Chrome |
| | The x-client-data header is an identifier that when combined with IP address and user-agent, uniquely identifies every individual download version of the Chrome browser. The x-client-data identifier is sent from the Chrome browser to Google every time users exchange an Internet communication, including when users log-in to their specific Google accounts, use Google services such as Google search or Google maps, and when Chrome users are neither signed-in to their Google accounts nor using any Google service. |
| IDE & SID | Value: Unique User Identifier |
| | The SID cookie is associated with a Google Display Ad (e.g., www.DoubleClick.net), and contains a value that can identify a user's Google Account (if they have one). The IDE cookie is also associated with a Google Display Ad (e.g. www.DoubleClick.net), and it contains a value that can identify the patient's device – the specific browser instance. Thus, the SID and IDE cookies can be used to uniquely identify and track individuals as they navigate the Internet, including as they communicate with Defendant's Website. Similar to Google Ads, Google associates the SID and IDE cookies for specific users and their devices to each other by acquiring them at the same time when a person is logged-in to their Google Account. Thereafter, Google's acquisition of either cookie by itself is sufficient for Google to associate any event acquired with the other cookie |

42.     As explained above, whenever a user is logged into their Gmail account or is using a Chrome browser, Google causes Defendant to send persistent cookies—such as the IDE, and SID cookies—along with personally identifiable information of users logged into their Google accounts (*i.e.*, the "Secure-3" cookies) and/or Chrome accounts (*i.e.*, the "X-Client-Data"). These cookies, along with all the other cookies that Google combines from third-party sources enable Google to obtain a clear profile of an individual user as well as the specific videos requested from Defendant's Website.

43.     In summary, Defendant discloses information to third parties, like Facebook and Google, that would make it reasonably and foreseeably likely that Facebook and Google could identify which specific user requested or obtained any specific video from Defendant's Website

and applications.

44.     The personal information Defendants obtained from Plaintiffs and Class Members is valuable data in the digital advertising-related market for consumer information. Because Defendant places advertisements alongside its prerecorded video content and embeds commercials within its video content, Defendant is incentivized to enhance the "targeting" of such ads, allowing companies who pay Defendant to reach their "ideal" audience.

45.     At no point did Plaintiff or the Class Members consent to Defendant's disclosure of their video viewing history to third parties. As such, Defendant deprived Plaintiff and the Class Members of their privacy rights and control over their personal information.

46.     The harms described above are aggravated by Defendant's continued retention and commercial use of Plaintiffs' and Class Members' personal information, including their private video viewing histories.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this action on behalf of herself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(3). Specifically, the Class is defined as:

> All persons in the United States who, during the maximum period of time permitted by law, logged in to Defendant's Website or applications and viewed prerecorded content using their mobile or computer browsers.

48.     The Class does not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

49.     Plaintiff reserves the right to amend the above class definition and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories

of liability.

50.     ***Community of Interest***: There is a well-defined community of interest among members of the Class, and the disposition of the claims of these members of the Class in a single action will provide substantial benefits to all parties and to the Court.

51.     ***Numerosity***: While the exact number of members of the Class is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Class number in the millions. Members of the Class may also be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

52.     ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individuals of the Class. These common legal and factual questions include, but are not limited to:

(a)     Whether Defendant collected Plaintiff's and the Class Members' PII;

(b)     Whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c)     Whether Defendant's disclosures were committed knowingly; and

(d)     Whether Defendant disclosed Plaintiff's and the Class Members' PII without consent.

53.     ***Typicality:*** Plaintiff's claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched videos on Defendant's Website and had her PII collected and disclosed by Defendant to third parties.

54.     ***Adequacy***: Plaintiff will fairly and adequately represent and protect the interests

of the Class as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Class because she has no interests which are adverse to the interests of the members of the Class. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel.

55.     Moreover, the proposed Classes can be maintained because they satisfy both Rule 23(a) and 23(b)(3) because questions of law or fact common to the Classes predominate over any questions affecting only individual members and a Class Action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a)     The expense and burden of individual litigation makes it economically unfeasible for members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b)     If separate actions were brought by individual members of the Class, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c)     Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
### Violation of the Video Privacy Protection Act
### 18 U.S.C. § 2710, *et seq.*

56.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

57.     The VPPA prohibits a "video tape service provider" from knowingly disclosing

"personally-identifiable information" concerning any "consumer" to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C. § 2710.

58.     As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials." Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering audiovisual materials—including the prerecorded videos that Plaintiffs viewed on the Website—that are similar to prerecorded video cassette tapes and those deliveries affect interstate or foreign commerce.

59.     As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." Plaintiff and the Class Members are subscribers of Defendant's Website and applications, which provide video content to users. Plaintiff and the Class Members are subscribers under the VPPA because they created an account to access the Website and applications and provided Defendant, at a minimum, their names, emails, addresses, credit card information, and other persistent cookies containing their PII, and the title of the videos they viewed.

60.     Defendants knowingly caused Plaintiff's and the Class Members' video viewing information, as well as the above-referenced unique identifiers, to be disclosed to third parties, including Facebook and Google. This information constitutes personally identifiable information under 18 U.S.C. § 2710(a)(3) because it identified each Plaintiff and Class member to third parties as an individual who viewed Defendant's content, including the specific prerecorded video materials watched on the Website and applications. This information allowed third parties,

such as Facebook and Google to identify each Plaintiff's and Class member's specific individual video viewing preferences and habits.

61.     As set forth in 18 U.S.C. § 2710(b)(2)(B), "informed, written consent" must be (1) in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; and (2) at the election of the consumer, is either given at the time the disclosure is sought or is given in advance for a set period of time not to exceed two years or until consent is withdrawn by the consumer, whichever is sooner. Defendant failed to obtain informed, written consent from Plaintiff and the Class Members under this definition.

62.     Defendant was aware that the disclosures to third parties that it shared through the tracking software that it incorporated in its Website and applications identified Plaintiffs and Class Members. Indeed, both Facebook and Google publicly tout their abilities to connect PII to individual user profiles. Defendants also knew that Plaintiff's and the Class Members' personal viewing content was disclosed to third parties because Defendant programmed the tracking into the Website application's code so that third parties would receive video titles or video IDs and the subscriber's unique third-party identifiers when a subscriber watched a prerecorded video. The purpose of those trackers was to obtain identifiable analytics and intelligence for Defendant about its user base, while also benefiting Facebook and Google, among other third parties, by providing them with additional data that they can leverage for their advertising, analytics and/or other services.

63.     Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Website's disclosures to Facebook and Google were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

64.     On behalf of herself and the Class Members, Plaintiff seeks declaratory relief, statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c), and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Class; and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)     For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)     For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c)     For compensatory, statutory and punitive damages in amounts to be determined by the Court and/or jury;

(d)     For prejudgment interest on all amounts awarded;

(e)     For an order of restitution and all other forms of equitable monetary relief; and

(f)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: January 31, 2024                         Respectfully submitted,

**GUCOVSCHI ROZENSHTEYN, PLLC**

By:  <u>/s/ Adrian Gucovschi</u>
     Adrian Gucovschi, Esq.

Adrian Gucovschi
140 Broadway, Suite 4667
New York, NY 10005
Tel: (212) 884-4230
adrian@gr-firm.com

*Counsel for Plaintiff and the Class*